Michael L. Mallow (SBN 188745)
mmallow@shb.com
Mark D. Campbell (SBN 108528)
mdcampbell@shb.com
Darlene M. Cho (SBN 251167)
dcho@shb.com
SHOOK, HARDY & BACON L.L.P.
2049 Century Park East, Suite 3000
Los Angeles, CA 90067
Telephone:  (424) 285-8330
Facsimile:   (424) 204-9093

Attorneys for Defendants
Mazda Motor of America, Inc.
d/b/a Mazda North American Operations
and Mazda Motor Corporation

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRY SONNEVELDT, et al., <br><br>　　　　Plaintiffs, <br><br>　vs. <br><br>MAZDA MOTOR OF AMERICA, INC. D/B/A MAZDA NORTH AMERICAN OPERATIONS and MAZDA MOTOR CORPORATION, <br><br>　　　　Defendants. | Case No. 8:19-cv-01298-JLS-KES <br><br> Assigned to: Hon. Josephine L. Staton <br><br> **MAZDA MOTOR OF AMERICA, INC. D/B/A MAZDA NORTH AMERICAN OPERATION'S AND MAZDA MOTOR CORPORATION'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF CHRISTOPHER WHITE, PHD; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:　　September 30, 2022 <br> Time:　　10:30 a.m. <br> Place:　　350 West 1st St. <br> 　　　　　Los Angeles, CA, 90012 <br> 　　　　　Courtroom 8A, 8th Floor <br><br> [Filed concurrently with Declaration of Darlene M. Cho; and [Proposed] Order] <br><br> Complaint Filed: June 28, 2019 |

MOTION TO EXCLUDE THE TESTIMONY OF DR. WHITE; MEMO OF POINTS & AUTHORITIES

# **TABLE OF CONTENTS**

INTRODUCTION..................................................................................................... 2

FACTUAL BACKGROUND................................................................................... 3

THE DAUBERT STANDARD................................................................................. 4

    I.    Dr. White's Opinion Related to the Use of HNBR for the Elastomer Bellows is Not Based on Scientific Facts or Data............. 5

    II.    Dr. White's Opinion that Exposure of the HNBR Bellows to the Coolant Causes Degradation Lacks any Scientific Basis. .................. 6

    III.    Dr. White's Opinion Related to the Purported Impact of the Alleged Defect is Not Based on Sufficient Facts or Data. ................. 8

    IV.    Dr. White's Opinion That There is a Common Defect in the Putative Class Vehicles is Unreliable. ......................................... 10

        A.    Dr. White Has no Basis to Opine There is a Common Defect in the Putative Class Vehicles. ..................................................................10

        B.    Dr. White's Opinion that the Purported Defect Causes the Water Pumps in the Putative Class Vehicles to Fail Prematurely is Speculative and Unreliable. ................................................11

    V.    Dr. White's Proposed Alternative Design is Not the Product of Reliable Principles and Methods................................................. 12

CONCLUSION .......................................................................................................13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Apple v. Atlantic Yards Dev. Co., LLC*,
  2015 WL 11182422 (E.D.N.Y. Mar. 31, 2015)............................................12

*Bourjaily v. United States*,
  483 U.S. 171 (1987).................................................................................... 4

*Cooper v. Brown*,
  510 F.3d 870 (9th Cir. 2007)....................................................................... 4

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)............................................................ 2, 4, 5, 6, 11, 12

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)................................................................................ 6, 11

*Goodness Films, LLC v. TV One, LLC*,
  2014 WL 12780291 (C.D. Cal. May 19, 2014) ...................................... 6, 13

*Grodzitsky v. Am. Honda Motor Co.*,
  2017 WL 8943159 (C.D. Cal. Oct. 30, 2017)............................................11

*Grodzitsky v. Am. Honda Motor Co.*,
  957 F.3d 979 (9th Cir. 2020), reh'g denied, No. 18-55417 (9th Cir.
  June 12, 2020).................................................................. 2, 3, 5, 8, 10, 12

*Guidroz-Brault v. Mo. Pac. R.R. Co.*,
  254 F.3d 825 (9th Cir. 2001).....................................................................10

*Heller v. Shaw Indus., Inc.*,
  167 F.3d 146 (3d Cir. 1999)....................................................................... 6

*Jinro Am. Inc. v. Secure Invs., Inc.*,
  266 F.3d 993 (9th Cir. 2001)...................................................................... 4

*Turpin v. Merrell Dow Pharmaceuticals, Inc.*,
  959 F.2d 1349 (6th Cir. 1992), cert. denied, 506 U.S. 826 S.Ct. 84,
  121 L.Ed.2d 47 (1992) .............................................................................11

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .................................................................................... 4

**Court Rules**

Fed. R. Evid. 702 ............................................................................... 2, 4, 12

Local Rule 7-3 ............................................................................................ 1, 2

# NOTICE OF MOTION AND MOTION TO STRIKE

**TO THE COURT, ALL PARTIES AND ALL ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on September 30, 2022, at 10:30 a.m. or as otherwise scheduled by the Court to be heard before the Honorable Josephine L. Staton, in Courtroom 10A of the United States District Court, Central District of California, located at 411 West Fourth Street, Santa Ana, California, 92701, Defendants Mazda Motor of America, Inc. d/b/a Mazda North American Operations ("MNAO") and Mazda Motor Corporation ("MC") will and hereby move this Court for an order excluding the testimony of Christopher White, Ph.D. pursuant to Fed. R. Evid. 104(a), 702, 703, and 403.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on April 29, 2022. *See* Declaration of Darlene M. Cho, filed concurrently herewith ("Cho Decl."), ¶ 2.

The motion is be based on this Notice, the following Memorandum of Points and Authorities in support thereof, and the Cho Declaration, as well as any supporting declarations and exhibits, the files and records in this action, and any further evidence or argument that this Court may properly receive at or before the hearing.

Dated: April 30, 2022

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By: */s/ Michael L. Mallow*

Michael L. Mallow
Attorneys for Defendants
Mazda Motor of America, Inc. d/b/a
Mazda North American Operations
and Mazda Motor Corporation

# INTRODUCTION

In their motion for class certification, Plaintiffs rely exclusively on the report of Christopher White, Ph.D. to support their contention that the internal water pumps in in model year (MY) 2008 – 2015 Mazda CX-9 and MY 2009 – 2013 Mazda6 vehicles with 3.7L engines Mazda CX-9 and the Mazda6 vehicles ("Putative Class Vehicles") are defective. Specifically, Dr. White opines that the mechanical properties of hydrogenated acrylonitrile butadiene rubber ("HNBR") used for the secondary or backup seal in the water pump (which is the same material widely used in automotive water pumps) are "known to degrade over time in coolant, particularly at high temperatures." Dkt. No. 319-5 at ¶ 19. Dr. White further opines "once degraded, the bellows can no longer serve their function to hold the two seal rings tight against each other, which allows coolant to leak past the seal rings, often into the oil pan where it mixes with and contaminates the oil." *Id.* Dr. White's opinion is of no use to Plaintiffs or this Court because it fails to meet Rule 702 requirements for proper opinion testimony.

Boiled down, Dr. White's report is unreliable and unscientific, and really nothing more than his own ipse dixit, which the Ninth Circuit clarified is insufficient to satisfy *Daubert*[1] requirements, especially in an automotive defect class action. *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985-86 (9th Cir. 2020), reh'g denied, No. 18-55417 (9th Cir. June 12, 2020).

In *Grodzitsky*, the Ninth Circuit affirmed the lower court's order excluding plaintiffs' expert's opinion as deficient under *Daubert*, and denying class certification for failure to meet the commonality requirements. *Id.* Specifically, the Ninth Circuit held the district court did not abuse its discretion in excluding the plaintiffs' expert's opinion where he had not used a workable standard supporting his design defect theory, lacked supporting studies or testing to demonstrate a common design defect,

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993) ("Daubert").

and had employed a deficient methodology. *Id*. The deficiencies in Dr. White's analysis are remarkably similar to those addressed by the Ninth Circuit in *Grodzitsky*. Just as was the case there, Dr. White does not use a workable standard to support his design defect theory, and lacks supporting studies or testing to show a common design defect. In fact, not only does Dr. White not have supporting studies or testing to show a common design defect, but Dr. White (despite being retained almost three years ago) did not perform any testing to support his theory. Just like in *Grodzitsky*, Dr. White also employs a deficient methodology and his opinion is based on statistically insignificant information. And just like in *Grodzitsky*, Dr. White's opinion should be excluded.

## FACTUAL BACKGROUND[2]

In support of Plaintiffs' motion for class certification, Plaintiffs submitted Dr. White's report. Dkt. No. 317-1 at 5. According to Dr. White, the Putative Class Vehicles all have a design defect which involves the use of HNBR for the elastomer bellows in the mechanical seal. Id. at ¶ 19. His opinion is that HNBR bellows undergo degradation due to exposure to coolant and "high temperatures" resulting in the growth of fatigue cracks. *Id*. After this alleged degradation, Dr. White contends that "the bellows can no longer serve their function to hold the two seal rings tight against each other, which allows coolant to leak past the seal rings, often into the oil pan where it mixes with and contaminates the oil." *Id*. Dr. White's deposition in this matter was taken on April 22, 2022. Cho Decl. Ex. B.

Despite being retained in 2019—almost three years ago[3]—Dr. White has never tested his theory. Cho Decl. Ex. B. at 74:7-13. Rather, to support his theory, Dr. White points to unidentified "engineering principles in understanding the design of the pump

---

[2] The Mazda Defendants refer the Court to the Cho Declaration Ex. A (Report of Corissa Lee, Ph.D) Section 2, which contains background about the water pumps in the Putative Class Vehicles.
[3] Cho Decl. Ex. B at 10:8-12.

to essentially come to the conclusion," his inspection of four failed water pumps from putative class vehicles and two replacement water pumps, a handful of documents from Mazda discussing two water pump investigations its inspection of two additional failed water pumps , and two articles. *Id*. at at 74:7-13; Dkt. No. 319-5 ¶13.

## THE DAUBERT STANDARD

The federal trial court acts as a "gatekeeper" for expert testimony, ensuring the proposed expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 597 (1993); *see* Fed. R. Evid. 702. Before a person can be "cloaked with the mantle of an expert[,]" care must be taken "to assure that [the] proffered witness truly qualifies as an expert, and that such testimony meets the requirements of Rule 702." *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001). "[T]he proponent has the burden of establishing the pertinent admissibility requirements are met by a preponderance of the evidence." Advisory Committee Notes on Rule 702—2000 Amendment (*citing Bourjaily v. United States*, 483 U.S. 171 (1987)) (emphasis added); *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

An expert must be qualified "by knowledge, skill, experience, training or education," and possess "scientific, technical, or other specialized knowledge" that "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The expert's opinions also must derive from "sufficient facts or data"; and he must explain the basis for his conclusions in a way that allows the court to determine whether he is using "reliable principles and methods," and is reliably applying them to the facts of the case. Fed. R. Evid. 702(c), (d). Thus, the expert's scientific evidence must be both relevant and reliable. *Daubert*, 509 U.S. at 589.

Courts should apply a *Daubert* analysis when a plaintiff offers expert testimony in support of class certification. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011). The analysis called for is "rigorous," which requires "judging the

4

persuasiveness of the evidence presented" for and against certification, including expert evidence. *Grodzitsky*, 957 F.3d 979 at 984 ("In evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*."). Courts are to resolve all factual and legal disputes relevant to class certification, even if doing so overlaps with the merits. *Id*.

## ARGUMENT

### I. Dr. White's Opinion Related to the Use of HNBR for the Elastomer Bellows is Not Based on Scientific Facts or Data.

Dr. White critiques the material selection of HNBR for the elastomer bellows, stating that "mechanical properties of HNBR are known to degrade over time in coolant, particularly at high temperatures." Dkt No. 319-5 ¶ 19.

While he never explains what he means by "high temperatures," his claim of a design defect implies that he is referring to the normal operating temperatures of the water pump in the engines of the Putative Class Vehicles. Dr. White can point to no literature or testing data to support his theory. Cho. Decl. Ex. A at p. 26. As Dr. Lee explains in her Report, while it is true that mechanical properties may change with exposure to chemicals and "high temperatures," to what extent depends on the specific chemical environment, temperature, and duration of exposure. *Id*. Dr. White does not address any of these factors in his report. *Id*. Regardless, his report lacks any analysis, evaluation, or testing of the HNBR's mechanical or chemical properties to support his theory that aging of the HNBR prevents the bellows from serving its function as a secondary seal under expected end-use conditions. *Id*. His opinion regarding HNBR degradation in coolant and "high temperatures" is inconsistent with the general consensus found in authoritative treatises, peer-reviewed journal articles, the Society of Automotive Engineers (SAE), and specific testing on the heat and chemical resistance of HNBR. *Id*.

As discussed in the Lee Report, peer-reviewed literature reports that HNBR is not expected to undergo significant degradation at temperatures below 329 °F (165 °C). This is well above the normal operating temperature of the water pumps in the Putative Class Vehicles, which is expected to range from 176 – 223 °F (80 – 106 °C). *Id.* Thus, in order for degradation to occur in the manner alleged by Dr. White, the elastomer bellows would need to be exposed to temperatures well above the normal or expected operating conditions. *Id.* Dr. White presents no evidence, nor could he, that the elastomer bellows is exposed to temperatures well above the normal or expected operating temperature of the water pumps in the Putative Class Vehicles. Thus, his opinion related to HNBR is of no use to the Court and must be excluded. *See Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999) ("[T]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia."); *Goodness Films, LLC v. TV One, LLC*, 2014 WL 12780291, at *1 (C.D. Cal. May 19, 2014) (citing *Daubert*, 509 U.S. at 591-92); *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 ) (1997) (where "opinion evidence . . . is connected to existing data only by the ipse dixit of the expert," a district court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

## II. Dr. White's Opinion that Exposure of the HNBR Bellows to the Coolant Causes Degradation Lacks any Scientific Basis.

Similarly, Dr. White's opinion that exposure of the HNBR bellows to the coolant causes degradation runs contrary to the scientific literature and long-term testing data produced in this matter. Cho Decl. Ex. A at pp. 26-27. As explained by Dr. Lee, in forming his opinion, Dr. White misinterprets and misrepresents peer-reviewed literature, and neglects to consider relevant context. *Id.* at 27. For example, two of the sources that Dr. White relies on involve compatibility testing of HNBR with Organic Acid Technology ("OAT") coolants of unknown composition at

temperatures of 302 °F (150 °C) 78 and 275 °F (135 °C), both of which are well above the expected maximum operating temperature in the subject Class Vehicles, which Dr. White estimated to be approximately 202 °F (94.5 °C). *Id*.

Furthermore, Dr. White misrepresents the testing reported in the 2001 SAE paper by Hertz et al., suggesting that Figure 24 of his report (reproduced as Figure 18 in the Lee Report) shows degradation of HNBR at more moderate temperatures. *Id*. In fact, the SAE paper is clear that "Aging of all samples took place at 135°C." *Id*. The temperature sweep data Dr. White refers to in Figure 24 is from dynamic mechanical and rheological thermal analysis (DMRT), a common materials analysis technique which measures the mechanical response of a material to loading at different temperatures. *Id*. The data shows the loss modulus as a function of temperature, after HNBR aging in OAT coolant at 135°C for different time periods. It does not show degradation or changes in loss modulus after aging at a lower temperature (i.e., 50 °C) as described by Dr. White in his deposition. *Id*. As Dr. Lee explains, regardless, neither the paper nor Dr. White have identified a link between a decrease in loss modulus (a measure of the liquid-like or viscous behavior of the material) and the ability of the material to perform its intended function as a seal.

Contrary to Dr. White's reliance on the paper by Hertz et al. to support his theory of HNBR degradation leading to changes in mechanical properties, when considered in its entirety, the Hertz paper in fact reports that HNBR undergoes minimal mechanical property changes as a result of aging. *Id*. at p. 28. The paper shows that although the HNBR exhibits some compression-set or permanent dimensional change after prolonged loading at high temperatures (at 135°C) in concentrated OAT coolant, mechanical properties such as the tensile strength, hardness (durometer), and elongation at break remained relatively constant. *Id*. Representative data illustrating the minimal change in mechanical properties after aging is reproduced as Figure 19 in the Lee Report. *Id*. Further, functional testing of

7

aged O-rings showed that the HNBR provided contact stresses similar to the highest performing rubber materials after 1000 hours of aging in coolant. *Id.* Thus, changes due to aging (which is, as Dr. Lee explains is expected of all rubbers placed under demanding service conditions over prolonged time periods) does not necessarily prevent HNBR from performing its function. *Id.* at pp. 28-29. Nonetheless, Dr. White has made no effort to measure or otherwise analyze the effect of alleged aging on the ability of the bellows to perform its intended functions, nor has he measured any changes in mechanical properties. *Id.* at p. 29. Indeed, while Dr. White has relied on a questionable review of literature, he ignores or is unaware of directly relevant functional testing and aging of HNBR bellows, such as the Bomb test, conducted as part of the validation testing of the mechanical seal used in subject Class Vehicles. Cho Decl. Ex. B at 108:4-10. As discussed in Section 5.3 of the Lee Report, HNBR bellows ██████████████████████████████████████

██████████████████████████████████████

██████████ Furthermore, as Dr. Lee explains, the compatibility of HNBR with glycol-based coolants is widely supported by the literature and marketed by HNBR manufacturers. Cho Decl. Ex. A. at p. 29. As such, Dr. White's theory that the HNBR material selection for the bellows used in all subject Class Vehicles is a design defect due to degradation from normal use that can ultimately cause water pump failure is speculative, without basis, and should be excluded. *Grodzitsky*, 957 F.3d at 985-86.

**III. Dr. White's Opinion Related to the Purported Impact of the Alleged Defect he Identified is Not Based on Sufficient Facts or Data.**

Based on Dr. White's visual inspection of four failed water pumps, he alleges a "loss in elasticity" citing compression set in HNBR bellows removed from the mechanical seals. Dkt No. 319-5 at ¶ 19. Dr. White has conducted no analysis or evaluation to demonstrate a change of the bellows function as a result of this compression set, nor did he measure any changes in mechanical properties.

Nonetheless, Dr. White's attempt to correlate his observation of compression set to changes in mechanical properties (without measurement or testing) in order to fit his design defect theory is simply unsupported, and in fact proven incorrect by the analysis described in Dr. Lee's Report. Cho Decl. Ex. A at 31. As described in Section 5.5 of the Lee Report, Exponent qualitatively compared the mechanical response (elasticity) of HNBR bellows from failed water pumps to an HNBR bellows from a new exemplar water pump. *Id*. This analysis showed that the bellows maintained the ability to deform elastically and recover. *Id*.; see also Cho Decl. Ex. C. Thus, the bellows from failed water pumps have not experienced any appreciable degradation while in service. *Id*. Moreover, as explained in Section 5.5 of the Lee Report, Exponent observed that the compression set in the HNBR bellows removed from failed water pumps was irrelevant because the metal spring (not the HNBR bellows) controlled the height of the bellows-spring assembly. *Id*. Notably, the bellows in the mechanical seal is always coupled with the spring component, and thus the height of the assembly dictates the mechanical response and function when the bellows-spring assembly is installed (compressed) in the mechanical seal, a fact that Dr. White neglects to consider. *Id*. As Dr. Lee further explains, despite bellows from failed pumps exhibiting compression set, when the height of bellows-spring assemblies from the failed water pumps was compared to the assembly from a new exemplar water pump, the heights were comparable. *Id*. Exponent's measurements demonstrate that the compression set of the bellows is compensated by the spring, which provides the axial force on the sealing rings. *Id*. Thus, Dr. White has no basis to opine that degradation or compression set of the HNBR bellows caused leakage between the seal rings.

     Nor has Dr. White provided any assessment of the "high static and time-dependent variable straining" of the elastomer bellows in the subject design, which he claims led to fatigue cracking of the elastomer. Dkt. No. 319-5 at ¶¶ 17-18. Dr. White

describes "shaft misalignment and face wear" on the primary sealing interface as the source of strains in the bellows. *Id.* at ¶ 17. As Dr. Lee explains in her report, by design, such strains should be minimal. Cho Decl. Ex. A at 32. Regardless, by Dr. White's own admission, he has not done any calculations, analysis or testing to identify the magnitude of these strains, nor has he evaluated or compared them to the mechanical properties of the HNBR bellows. Cho Decl. Ex. B at 102:8-103:14. He states that "the prevention of fatigue cracks developing in the elastomer is a critical bellows design objective," (Dkt No. 319-5 at ¶ 18) but fails to acknowledge or is unaware that HNBR is known for its excellent fatigue resistance and that the subject mechanical seal ███████████████████. Cho Decl. Ex. A at 32 (citing SAE J1245 "Guide to the Application and Use of Engine Coolant Pump Face Seals). Thus, this portion of Dr. White's opinion should also be excluded. *Grodzitsky*, 957 F.3d at 985-86.

## IV. Dr. White's Opinion That There is a Common Defect in the Putative Class Vehicles is Unreliable.

### A. Dr. White Has no Basis to Opine That There is a Common Defect in the Putative Class Vehicles.

Dr. White's opinion that there is a common defect in the putative class vehicles is unsupported and does not rest upon sufficient facts or data. *See Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 831-32 (9th Cir. 2001).

Dr. White conducted inspections of four failed water pumps and claimed that "it was evident that the damage to the four failed Internal Water Pumps was similar and caused by the Design Defect." Dkt No. 319-5 at ¶ 44. However, his analysis is based only on his visual observation of "material damage." *Id.* at ¶ 45. Contrary to the title of Section V in his report, "Inspection and Testing of the Subject Water Pumps Reveals the Defect is Identical," Dr. White did not detail any testing or report on any testing data, nor did he describe any testing during his deposition. In addition, as Dr.

Lee explains in her report, Dr. White did not employ any of the techniques commonly used to perform an analysis of failed elastomers, such as microscopy, chemical characterization by FTIR, or mechanical property measurements of the allegedly degraded material. Cho Decl. Ex. A at 30. Nor did he provide any analysis to show whether the alleged degradation of the elastomer bellows caused the pump failure or occurred as a result of the failure. *Id*.

### B. Dr. White's Opinion that the Purported Defect Causes the Water Pumps in the Putative Class Vehicles to Fail Prematurely is Speculative and Unreliable.

Dr. White opines that the water pumps in the class vehicle are failing prematurely (or as Dr. White describes it, prior to the expected life of the engine), which according to Dr. White is prior to 150,000 miles. (Dkt. No. 319-5 ¶ 52). This part of Dr. White's opinion is based on his inspection of the four failed water pumps and a handful of documents from Mazda discussing its inspection of two additional failed water pumps. *Id*. at ¶ 13; Cho Decl. Ex. B at 74:7-13. Looking at such a small percent of a product population is not statistically significant and cannot lead to a reasonably scientific conclusion that water pump failures in the entire population of the Putative Class Vehicles are caused by the same purported defect. While "[t]rained experts commonly extrapolate from existing data … nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence connected to existing data only by the ipse dixit of the expert." *Joiner*, 522 U.S. at 146. Where, as here, there are too few data points to meaningfully extrapolate to the entire putative class, the court may reasonably "conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*. (*citing Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992), cert. denied, 506 U.S. 826, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992)); *Grodzitsky v. Am. Honda Motor Co.*, 2017 WL 8943159, at *3-4 (C.D. Cal. Oct. 30, 2017), aff'd, 957 F.3d 979 (9th

Cir. 2020) ("In order to make this sort of probabilistic claim about a larger population based on an inspection of a smaller subset, some minimal level of statistical significance needs to be met."); *Apple v. Atlantic Yards Dev. Co., LLC*, 2015 WL 11182422 at *9 (E.D.N.Y. Mar. 31, 2015) (excluding an expert's opinion when the expert did not establish that the sample he tested was statistically significant.").

Even setting that aside, Dr. White has no basis to claim the purported defect he identified causes any water pumps in any putative class vehicles to fail prematurely. When pressed on why he believes the purported defect he identifies can cause the water pumps to fail prior to expected service life, the only response Dr. White could muster was that he is aware of "some vehicles where the internal water pump has failed prior to the expected service life." Cho Decl. Ex. B. at 85:12-86:2. In other words he believes the purported defect he identifies is causing the water pumps to fail prematurely because water pumps are failing prematurely. Such circular reasoning does not come close to exhibiting the scientific basis or rigor required to satisfy Federal Rule of Evidence 702 or *Daubert*.

The unreliability of Dr. White's opinion that the purported defect he identifies can cause the water pumps in the Putative Class Vehicles to fail prematurely is confounded by his testimony that he has no idea (and as he testifies, he does not care) about the failure rate caused by purported defect he identifies. Cho Decl. Ex. B at 80:10-81:18. In other words, he has no idea whether the purported defect has any impact on the Putative Class Vehicles, let alone that it caused or will cause any water pump in the Putative Class Vehicles to fail prematurely. In fact, Dr. White would not even say that the defect he identified was "a material design defect." *Id*. at 80:23-81:3.

**V.   Dr. White's Proposed Alternative Design is Not the Product of Reliable Principles and Methods.**

Dr. White's analysis regarding his proposed alternative design is similarly unsupported. He claims that a "shielded" bellows design is superior and remedies the

12

alleged design defect. Dkt. No. 319-5 at ¶¶ 57-59. However, Dr. White admits that he "did not test the redesigned Ford water pump" and "did not do testing of the bellows seal" to substantiate his opinion, nor did he conduct any research to provide basis that this design minimizes aging of the bellows seal. Cho Decl. Ex. B at 190:20-191:5, 195:22-25. While Dr. White claims that the design is superior because "the bellows is not in direct contact with the coolant," when asked whether the coolant could get around the shielding, he admitted that he "did not test that." *Id*. at 191: 6-10, 191:22-192:1. Further, without testing, Dr. White acknowledges that some region of the bellows may be exposed to coolant, but he postulates that such an amount is acceptable. *Id.* at 191:11-16, 195:10-25. Again without any testing, analysis, or peer-reviewed literature to support this opinion. As such, Dr. White's insistence that the shielding prevents the majority of the bellows from contact with the coolant is entirely unsubstantiated, purely speculative, not the product of reliable principles or methods, and should be excluded as unreliable. *See Goodness Films, LLC*, 2014 WL 12780291 at *1.

## CONCLUSION

Because Dr. White's opinions are not the product of reliable principles and methods, the Mazda Defendants respectfully request that this Court grant its motion in full, exclude Dr. White's testimony, opinions, and afford no weight to them.

Dated: April 29, 2022

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By: */s/ Michael L. Mallow*
Michael L. Mallow
Attorneys for Defendants
Mazda Motor of America, Inc. d/b/a
Mazda North American Operations
and Mazda Motor Corporation