UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| TERRY SONNEVELDT, et al.,<br><br>            Plaintiffs,<br><br>     v.<br><br>MAZDA MOTOR OF AMERICA, INC.<br>D/B/A MAZDA NORTH AMERICAN<br>OPERATIONS and MAZDA MOTOR<br>CORPORATION,<br><br>         Defendants. | CASE NO.  8:19-cv-01298-JLS-KES<br><br>**ORDER:  (1) GRANTING<br>DEFENDANTS' MOTION TO<br>EXCLUDE THE MERITS REPORT<br>AND TESTIMONY OF<br>CHRISTOPHER WHITE, PH.D. (Doc.<br>478); (2) GRANTING DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT (Doc. 411); (3)<br>DECERTIFYING CLASSES; and (4)<br>DENYING AS MOOT OTHER<br>PENDING MOTIONS (Docs. 479, 480,<br>481, 485)** |

Before the Court is a Motion for Summary Judgment ("MSJ") filed by Defendants Mazda Motor of America, Inc. d/b/a Mazda North American Operations ("MNAO") and Mazda Motor Corporation ("MC") (collectively, "Mazda"). (MSJ, Doc. 411, MSJ Mem., Doc. 411-1.) Plaintiffs opposed, and Mazda replied. (MSJ Opp., Doc. 473; MSJ Reply, Doc. 499.) On December 1, 2022, the Court requested supplemental briefing from Plaintiffs and Mazda addressing pre-sale knowledge issues, and the parties filed their supplemental briefs on December 15, 2022. (Pls.' Supp'l Brief, Doc. 537; Mazda's Supp'l Brief., Doc. 539.)

Also before the Court are five *Daubert* motions: (1) Mazda's Motion to Exclude the Merits Report and Testimony of Christopher White, Ph.D. (White Mot., Doc. 478; White Mot. Opp. 527; White Mot. Reply, Doc. 548); (2) Mazda's Motion to Exclude the Testimony of Steven Gaskin, Colin Weir, and Susan Thompson (Pls.' Dam. Exps. Mot., Doc. 485; Pls.' Dam. Exps. Mot. Opp., Doc. 528; Pls.' Dam. Exps. Mot. Reply, Doc. 541); (3) Plaintiffs' Motion to Exclude the Report and Testimony of Defendants' Expert Larry Chiagouris (Chiagouris Mot., Doc. 479; Chiagouris Mot. Mem., Doc. 479-1; Chiagouris Mot. Opp., Doc. 525; Chiagouris Mot. Reply, Doc. 542); (4) Plaintiffs' Motion to Exclude the Report and Testimony of Defendants' Expert Victor Hakim (Hakim Mot., Doc. 480; Hakim Mot. Mem., Doc. 480-1; Hakim Mot. Opp., Doc. 526; Hakim Mot. Reply, Doc. 544); and (5) Plaintiffs' Motion to Exclude the Report and Testimony of Defendants' Expert Corissa Lee (Lee Mot., Doc. 481; Lee Mot. Mem., Doc. 481-1; Lee Mot. Opp., Doc. 530; Lee Mot. Reply, Doc. 543).

Having considered the parties' briefs and underlying evidence, and having held oral argument, the Court: (1) GRANTS Mazda's Motion to Exclude the Merits Expert Report and Testimony of Christopher White, Ph.D.; (2) GRANTS Mazda's Motion for Summary Judgment; (3) DECERTIFIES all the Classes in the case; and (4) DENIES AS MOOT Mazda's Motion to Exclude the Testimony of Steven Gaskin, Colin Weir, and Susan Thompson and Plaintiffs' *Daubert* motions.

## I.    BACKGROUND

The Court has detailed the background facts in this action in prior orders and will not recount those facts extensively here.  This is a class action involving Mazda's 2008–2015 CX-9s and 2009–2013 Mazda6s (the "Class Vehicles").  According to Plaintiffs, all of the water pumps in the Class Vehicles contain a design defect in the mechanical seal (the "Design Defect" or "Defect") that causes the water pumps to fail prematurely—*i.e.*, before the end of the useful service life of the Class Vehicles, or before the Class Vehicles reach 150,000 miles.  (MSJ Opp. at 3.)  Plaintiffs allege that Mazda has known about the Defect and the risks that it poses to the Class Vehicles' functionality and passengers' safety as early as 2005.  (*Id.* at 2, citing Plaintiffs' Statement of Genuine Disputes of Material Fact ("PSOF") ¶¶ 27, 28, 30, at 26–27, Doc. 473-1.)  Per Plaintiffs, Mazda intentionally concealed the Defect and continued to sell the Class Vehicles to "unsuspecting consumers" in spite of this knowledge, violating various states' consumer protection statutes, common law fraud prohibitions, and California's implied warranty law. (MSJ Opp. at 2, 8–25.)

The remaining Plaintiffs in this action, their causes of action against Mazda, and the Classes that they represent are the following.

Plaintiff Esther Wright Schneider leased a new 2011 Mazda CX-9 Touring Edition in October 2011 in Carlsbad, California.   (SAC ¶ 27, Doc. 196.)  In October 2014, she purchased her CX-9 after the lease expired.  (*Id.*)  In May 2018, the water pump in Wright Schneider's CX-9 failed at approximately 114,000 miles and caused the CX-9's engine to fail.  (*Id.*)  Wright Schneider brings common law fraud claims against Mazda, as well as claims under California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA"), Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"). (SAC ¶¶ 185–229.)  Wright Schneider represents the California Class.  (Class Certification Order at 5, 75–76, Doc. 512.)

3

Plaintiffs Lawrence and Monika Bohana purchased a new Mazda CX-9 in April 2010 in Riverside, California.  (SAC ¶ 28.)  In August 2019, the water pump in the Bohanas' CX-9 failed at approximately 72,000 miles and resulted in engine failure.  (*Id.*)  The Bohanas bring claims against Mazda under the CLRA, the UCL, and the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1791, *et seq*. ("SBA").  (SAC ¶¶ 166–184, 196–229.)  The Bohanas also bring common law fraud claims against Mazda.  (*Id.* ¶¶ 185–95.)  Like Schneider, the Bohanas represent the California Class.[1]  (Class Certification Order at 5, 75–76.)

Plaintiff Brian Hume purchased a new 2015 Mazda CX-9 in Metairie, Louisiana in February 2016.  (SAC ¶ 32.)  In May 2019, the water pump in Hume's CX-9 failed at approximately 83,000 miles.  (*Id.*)  Hume brings a claim of breach of warranty against redhibitory defects under Louisiana's redhibition articles, La. Civ. Code Ann. arts. 2520, 2524, and a claim under Louisiana's Product Liability Act, La. Stat. Ann. §§ 9:2800.51, *et seq*. ("LPLA").[2]  (SAC ¶¶ 314–47.)

Plaintiff Jean Levasseur purchased a used 2011 Mazda CX-9 in January 2014 in Wakefield, Massachusetts.  (*Id.* ¶ 33.)  In May 2019, Levasseur's CX-9 had its water pump fail at approximately 91,000 miles.  (*Id.*)  Levasseur brings a claim against Mazda under the Massachusetts Consumer Protection Act, Mass. Gen. Laws 93A ("MACPA"). (SAC ¶¶ 365–81.)  Levasseur represents the Massachusetts Class.  (Class Certification Order at 5, 75–76.)

Plaintiff Terry Sonneveldt purchased a used 2012 Mazda CX-9 in October 2018 in Traverse City, Michigan.  (SAC ¶ 34.)  In April 2019, Sonneveldt's CX-9 had its water

---

[1] The Court certified a Song-Beverly Class, with the Bohanas as its representatives, on October 21, 2022.  (Class Cert. Order at 75, Doc. 512.)  The Court then decertified the Song-Beverly Class in an interim Order issued on January 25, 2023.  (*See* Decert. Order at 12–14, Doc. 572.)

[2] Although Plaintiffs moved for certification of a Louisiana Class, the Court denied certification on the grounds that Plaintiffs failed to show that a class-wide measure of damages was available for the LPLA claims asserted by the putative class against Mazda.  (Class Cert. Order at 39 n.2, 65–67.)

pump fail, resulting in engine failure, at approximately 115,000 miles.  (*Id.*)  Sonneveldt brings a claim against Mazda under the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.903, *et seq.* ("MICPA").  (SAC ¶¶ 409–28.)  Sonneveldt represents the Michigan Class. (Class Certification Order at 5, 75–76.)

Plaintiff Jacqueline Aslan purchased a used 2013 Mazda CX-9 in St. Louis, Missouri in 2016.  (SAC ¶ 35.)  In August 2019, Aslan's CX-9 suffered water pump and engine failure at approximately 79,000 miles.  (*Id.*)  Aslan brings a claim against Mazda under the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.* ("MMPA").  (SAC ¶¶ 445–65.)  Aslan represents the Missouri Class.  (Class Certification Order at 5, 75–76.)

Plaintiff Christopher Lacasse purchased a used 2010 Mazda CX-9 Touring Edition in 2016 in Sanford, North Carolina.  (SAC ¶ 36.)  In November 2018, Lacasse's CX-9's water pump and engine failed at approximately 98,000 miles.  (*Id.*)  Lacasse brings a claim against Mazda under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75–1.1, *et seq.* ("NCUDTPA").[3]  (SAC ¶¶ 481–96.)

Plaintiff David Dennis purchased a new 2012 Mazda CX-9 in 2012 in Columbus, Ohio.  (SAC ¶ 38.)  In July 2019, Dennis's CX-9's water pump failed, resulting in engine failure, at approximately 93,000 miles.  (*Id.*)  Dennis brings a claim of fraud under Ohio common law against Mazda.  (*Id.* ¶¶ 513–22.)  Dennis represents the Ohio Class.  (Class Certification Order at 5, 75–76.)

---

[3] In its October 21, 2022 Class Certification Order, the Court determined that Mazda did not owe Lacasse any duty to disclose under the NCUDTPA as a matter of law because, as a purchaser of a used Class Vehicle from a third-party seller, Lacasse did not enter into a transaction or establish a relation with Mazda that would obligate Mazda to disclose anything to Lacasse.  (*See* Class Cert. Order at 56–58.)  That determination alone is sufficient grounds to enter summary judgment against Lacasse, but the Court did not dismiss Lacasse's claim explicitly in its Class Certification Order.  Further, Mazda moved for summary judgment on all the named Plaintiffs' claims—including Lacasse's—before the Court ruled on class certification.  Accordingly, the Court treats Lacasse as a remaining Plaintiff for the purposes of deciding Mazda's Motion for Summary Judgment.

Plaintiff Erin Matheny purchased a new 2012 Mazda CX-9 in January 2013 in McKinney, Texas. (SAC ¶ 39.) In June 2018, Matheny's CX-9's water pump and engine failed at approximately 85,000 miles. (*Id.*) Matheny brings a claim against Mazda under the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41, *et seq.* ("TDTPA").[4] (SAC ¶¶ 592–618.)

Plaintiff Tim Halwas purchased a new 2009 Mazda CX-9 in July 2009 in McKinney, Texas. (SAC ¶ 40.) In May 2019, Halwas's CX-9 suffered water pump and engine failure at approximately 107,000 miles. (*Id.*) Halwas also brings a claim against Mazda under the TDPTPA. (*Id.* ¶¶ 592–618.)

Plaintiff Lewis Delvecchio purchased a new 2009 Mazda6 in April 2009 in North Chesterfield, Virginia. (SAC ¶ 41.) In November 2017, Delvecchio's Mazda6 suffered water pump failure at approximately 120,900 miles. (*Id.*) Delvecchio brings a claim under the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-198 ("VCPA") and a claim of Virginia common law fraud against Mazda. (SAC ¶¶ 637–67.) Delvecchio represents the Virginia Class. (Class Certification Order at 5, 75–76.)

Plaintiff Jon Sowards purchased a used 2015 Mazda CX-9 in 2017 in Virginia. (SAC ¶ 42.) In January 2019, Sowards's CX-9 suffered water pump and engine failure at approximately 67,000 miles. (*Id.*) Sowards also brings a claim under the VCPA and a claim of Virginia common law fraud against Mazda. (*Id.* ¶¶ 637–67.) Like Delvecchio, Sowards represents the Virginia Class. (Class Certification Order at 5, 75–76.)

The basic facts about the Class Vehicles' water pumps and Plaintiffs' theory of the Defect are as follows. Water pumps circulate engine coolant within the engine block to remove heat from temperature sensitive engine components and maintain optimum engine operating temperatures. (PSOF ¶ 3, at 21.) Unlike traditional water pumps, which are located external to the engine block and driven by an auxiliary belt, the water pumps in the

---

[4] The Court certified a Texas Class on October 21, 2022. (Class Cert. Order at 76.) The Court then decertified the Texas Class in an interim Order issued on January 25, 2023 (*See* Decert. Order at 7–11.)

Class Vehicles are mounted behind the timing cover, internal to the engine block, and are driven by the engine's timing chain.  (*Id.* ¶ 4, at 21.)  Within the water pumps, mechanical seals are used to prevent coolant from flowing from the impeller side to the drive shaft side of the pump.  (*Id.* ¶ 11, at 23.)

According to Plaintiffs, the Defect in the Class Vehicles' water pumps is that a key component of the mechanical seal, the elastomer bellows, is made of hydrogenated acrylonitrile butadiene rubber ("HNBR"), which degrades when it is exposed to coolant that reaches high temperatures during vehicle operation.  As Plaintiffs' mechanical engineering expert, Dr. Christopher White, puts it:

> [T]he design defect in the Internal Water Pump in the Class Vehicles is the use of [HNBR] for the elastomer bellows in the mechanical seals in combination with a bellows design such that the bellows are fully immersed in, and in full contact with, the engine coolant and exposed to high temperatures.

(*Id.* ¶ 10, at 22, citing White Merits Rep. ¶ 12, Doc. 478-2.)  White further hypothesizes that

> Temperature of the coolant in which the HNBR elastomer bellows is immersed in [sic] will degrade (age) the HNBR bellows much faster in an internal water pump compared to an external water pump.  The placement of the water pump in the Vehicles behind the engine cover exposes the HNBR elastomer bellows to temperatures above the temperature displayed on the vehicle engine coolant temperature gauge.

(PSOF ¶ 16, at 24, citing White Merits Rep. ¶¶ 97, 61–99.)  Degradation of the elastomer bellows, in turn, allows coolant to leak past the mechanical seal in the Class Vehicles' water pumps, often into the oil pan in the Vehicles' engines, which can lead to catastrophic engine failure.  (PSOF ¶¶ 17–18, at 24–25, citing White Merits Rep. ¶¶ 23–25, 113–67.)  White concludes that the internal water pumps in the Class Vehicles are prone to failure

due to the Design Defect, and that "the Design Defect is the root cause of the Internal Water Pump Failures in the Class Vehicles." (PSOF ¶¶ 20–21, at 25, citing White Merits Rep. ¶¶ 161, 163.) According to White, a redesigned mechanical seal that Ford implemented in 2020 addresses the Defect and can be retrofitted onto the Class Vehicles. (PSOF ¶¶ 22–23, at 25, citing White Merits Rep. ¶¶ 108–112, 168–78.)

Mazda moved to exclude White's opinions and testimony at the class certification stage on the grounds that White's opinions were unreliable, speculative, and lacking in factual support. The Court rejected Mazda's arguments at the time, reasoning that

> White has not proffered an analysis of how many water pumps in the putative Class Vehicles have failed or will fail due to the design defect that he identifies, but he opines that the defect *can* cause the pumps to fail. . . . Whether White can prove that his hypothesized defect has in fact caused water pumps in the Class Vehicles to fail is a merits issue.

(Class Cert. Order at 22, Doc. 512.) The Court emphasized that many of Mazda's challenges were premature at the class certification stage, and that White's analysis was sufficient, at that stage, to demonstrate that the existence of a Defect common to all Class Vehicles was susceptible to common proof. (*Id.* at 31.) In the context of class certification, the Court rejected Mazda's arguments regarding the reliability of White's methods and whether his opinions flowed from a reliable analysis of the facts—but the Court did so before having an opportunity to examine White's July 26, 2022 Merits Report and before Mazda's motion to exclude White's opinions in that report had been fully briefed.

On January 6, 2023, the Court held extensive oral argument on Mazda's Motion for Summary Judgment and Mazda's *Daubert* motions. In advance of the hearing, the Court instructed the parties to prepare timeline demonstratives addressing Plaintiffs' evidence of Mazda's alleged knowledge of the Defect and identified for the parties the specific issues

raised by Mazda's motions that it wished the parties to address in oral argument
(Demonstratives Order, Doc. 549; Hearing Order, Doc. 554.)

## II.    LEGAL STANDARD

### A. SUMMARY JUDGMENT

In deciding a motion for summary judgment, the Court must view the evidence in
the light most favorable to the non-moving party and draw all justifiable inferences in that
party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary
judgment is proper "if the [moving party] shows that there is no genuine dispute as to any
material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a). A factual dispute is "genuine" when there is sufficient evidence such that a
reasonable trier of fact could resolve the issue in the non-movant's favor, and a fact is
"material" when it might affect the outcome of the suit under the governing law.
*Anderson*, 477 U.S. at 248. But "credibility determinations, the weighing of evidence, and
the drawing of legitimate inferences from the facts are jury functions, not those of a
judge." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013) (quoting *Reeves
v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (cleaned up)).

"The evidence of the non-movant is to be believed, and all justifiable inferences are
to be drawn in his favor." *Anderson*, 477 U.S. at 255. But a "court need not draw *all*
possible inferences in [the non-movant's] favor . . . only all *reasonable* ones." *Villiarimo
v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 n.10 (9th Cir. 2002) (emphasis in original);
*see also O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464, 1466–67 (9th Cir. 1986)
("We scrutinize the evidence and reasonable inferences to determine whether there is
sufficient probative evidence to permit 'a finding in favor of the opposing party based on
more than mere speculation, conjecture, or fantasy.'"). Speculation and conjecture are

insufficient to defeat summary judgment. *Getz v. Boeing Co.*, 654 F.3d 852, 865 (9th Cir. 2011); *cf. Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."). Further, a motion for summary judgment may not be defeated when the non-movant's evidence "is merely colorable, or is not significantly probative." *Anderson*, 477 U.S. at 249–50. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient"—the evidence must be such that "reasonable jurors could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict." *Id.* at 252. "Conclusory statements without factual support are [also] insufficient to defeat a motion for summary judgment." *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008) (citing *Nat'l Steel Corp. v. Golden Eagle Ins. Corp.*, 121 F.3d 496, 502 (9th Cir. 1997)).

The role of the Court is not to resolve disputes of fact but to assess whether there are any factual disputes to be tried. The moving party bears the initial burden of demonstrating the absence of a genuine dispute of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once the moving party carries its initial burden, the adverse party 'may not rest upon the mere allegations or denials of the adverse party's pleading,' but must provide affidavits or other sources of evidence that 'set forth specific facts showing that there is a genuine issue for trial.'" *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)). And the evidence that the parties present must be admissible. Fed. R. Civ. P. 56(c). If the non-movant does not make a sufficient showing to establish the elements of its claims, summary judgment is appropriate. *See Celotex*, 477 U.S. at 323.

## B. ADMISSION OF EXPERT TESTIMONY

Whether expert testimony is admissible is determined under Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Rule 702 provides that expert opinion is admissible if (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702; *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014).

Through the *Daubert* line of cases, the Supreme Court has made clear that Rule 702 imposes a "gatekeeping" obligation on the district court to ensure that proposed expert testimony is relevant and reliable. *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000). Testimony rests on a "reliable foundation" if it is rooted "in the knowledge and experience of the relevant discipline." *City of Pomona*, 750 F.3d at 1044. In turn, testimony is "relevant" if the knowledge underlying it has a "valid connection to the pertinent inquiry." *Id.* "*Daubert*'s general holding—setting forth the trial judge's general gatekeeping obligation—applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge." *United States v. Alatorre*, 222 F.3d 1098, 1101 (9th Cir. 2000) (cleaned up). The test for reliability is flexible and depends on the discipline involved. *Kumho Tire*, 526 U.S. at 141.

The proponent of the expert carries the burden of proving admissibility. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Expert testimony is admissible if the aforementioned requirements are met by a preponderance of the evidence. *Daubert*, 509 U.S. at 593 n.10 (discussing applicability of Federal Rule of

Evidence 104(a) to expert testimony and citing *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987), for preponderance standard).  A district court possesses "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152.

In determining the reliability of proffered expert testimony, the district court's task "is to analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1316 (9th Cir. 1995). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  To avoid such a lacuna, the proponent of expert testimony must "explain the methodology the experts followed to reach their conclusions [and] point to any external source to validate that methodology." *Daubert II*, 43 F.3d at 1319; *see also Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) ("The reasoning between steps in a theory must be based on objective, verifiable evidence and scientific methodology of the kind traditionally used by experts in the field.")

## III.    DISCUSSION

The admissibility of White's opinions and testimony determines whether Plaintiffs can demonstrate triable issues of fact as to several elements of their claims, including the existence of the Design Defect and whether its existence is a material fact that Mazda should have disclosed to consumers.  Accordingly, the Court addresses Mazda's Motion to Exclude the Merits Report and Testimony of Christopher White, Ph.D. first, and then addresses Mazda's Motion for Summary Judgment.

## A.  WHITE'S DEFECT AND CAUSATION OPINIONS

At class certification, the Court rejected Mazda's arguments to exclude White's
opinions and testimony.  Mazda's arguments included the claim that "White's opinions
cannot establish the existence of a common defect because: (1) without opining on a
failure rate caused by the purported defect, White cannot connect his defect theory with
actual pump failures in the field—*i.e.*, he cannot prove that the defect causes water pumps
in the Class Vehicles to fail; and (2) water pump failures in the Class Vehicles can occur
due to other root causes."  (Class Cert. Order at 28.)  Relying on the Ninth Circuit's
opinion in *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168 (9th Cir.
2010), the Court reasoned that Mazda's arguments sought "premature resolution on the
merits."  (Class Cert. Order at 29.)  The Court declined Mazda's invitation to weigh
evidence of other causes of water pump failure in the Class Vehicles against White's
testimony about the alleged Defect as "inappropriate at this stage."  (*Id*. at 31.)

As noted above, Mazda's renewed motion to exclude White's opinions and
testimony at the merits stage had not been fully briefed before the Court decided class
certification.  In its Reply in support of its second motion as well as during oral argument,
Mazda emphasized the insufficiency of White's opinions regarding how the Defect affects
the performance of the Class Vehicles and whether White can prove that the Defect causes
water pump failures in the field.  According to Mazda, "Dr. White's opinion linking his
defect theory to actual water pump failure is facially inadequate, as Dr. White does not
opine that his defect theory has caused any water pump failures, but rather, only that it *may*
cause such failures."  (White Mot. Reply at 1.)

Mazda's characterization of White's testimony is not exactly right.  As Plaintiffs
emphasized during oral argument, White's opinion is that the Defect has caused, does
cause, and will cause water pump failures in the Class Vehicles.  There is no question that
White opines that the Defect has caused *some* failures: in his Merits Report, White

13

concludes that his analysis of the damaged components in the four failed water pumps that he examined "indicates that the failure mode was the same between the four pumps"—*i.e.*, that the HNBR elastomer bellows in those pumps had degraded to the point where they could no longer adequately perform their function within the pumps' mechanical seal. (White Merits Rep. ¶ 160.)  White also claims that so-called "teardown reports" produced in this case that note hardening of or thermal damage to the HNBR bellows in failed water pumps "are fully in line with my opinion that degradation of the bellows will cause the elastomer bellows to lose elasticity, resulting in compression set and water pump failure." (*Id.* ¶¶ 58–60.)  Thus, White's opinion is not that the Defect simply *may* cause water pump failures in the Class Vehicles, but that it has and does.  Indeed, White goes even farther than that: he claims that "the HNBR elastomer bellows in the mechanical seal and the bellows design" is "the root cause of the Internal Water Pump failures."  (*Id.* ¶¶ 107, 117, 161.)

The key questions before the Court, then, are whether White's diagnosis of the failure mode of the water pumps that he inspected has proper support and whether his conclusion that the Defect is the "root cause" of water pump failures in the Class Vehicles adequately flows from his analysis.  After considering White's Merits Report, his deposition testimony, and the parties' discussion of White's theory of the Defect and its foundations, the Court finds that White's opinions on the Defect lack an adequate factual and analytical basis.  The Court addresses fundamental deficiencies in White's opinions seriatim.

### 1.  White Presents a Comparative Defect Without Comparative Data

As an initial matter, the Court notes that White's theory of the Defect is, by definition, a comparative one.  White posits that using an unshielded HNBR elastomer bellows in an internal water pump is a design flaw because HNBR will degrade "much

faster" when used in internal water pumps as opposed to external ones because internal water pumps present a more demanding thermal environment.  (*Id.* ¶ 97.)  White does not argue that using an unshielded HNBR elastomer bellows in an *external* water pump would be defective.  White also does not argue that HNBR bellows will not degrade when used in external water pumps.   There is therefore no dispute that HNBR is a proper material to use for the elastomer bellows in external water pumps, and that HNBR—like any material—degrades under normal use conditions, regardless of whether it is in an external or an internal water pump.  Put otherwise, White recognizes that HNBR is an acceptable material to use for the HNBR bellows in external water pumps and that it will inevitably degrade regardless of the type of pump in which it is used.  Therefore, to support his theory of the Defect, White needs to show that HNBR does degrade faster and, as a consequence, performs worse in internal water pumps than it does in external water pumps—*i.e.*, that the water pumps in the Class Vehicles fail more frequently or earlier than external water pumps in comparable vehicles.  Yet White has not analyzed the rate at which the Class Vehicles' water pumps fail prematurely, let alone compared that rate with failure rates for external water pumps.

The analysis that White does offer is not sufficient to support his claim that the HNBR elastomer bellows in fact degrades "much faster" in internal water pumps than in external water pumps.  To demonstrate the key premise that the thermal environment the HNBR bellows faces in internal water pumps is categorically more demanding than the thermal environment in external water pumps, White relies on a thermodynamic analysis. (*Id.* ¶¶ 61–99.)  White's analysis leads to a general conclusion:  "Compared to an external water pump, the temperature of the coolant in the spring-bellows[] chamber in an internal water pump will always be higher."  (*Id.* ¶ 97.)  White does not explain *how much* higher this temperature will be in an internal water pump compared to an external water pump. Nor does White offer any empirical data showing that the temperature of the coolant is in fact generally higher in internal water pumps than in external water pumps.  Further, White

admitted in his deposition that he did not attempt to validate his hypothesis about the coolant temperature with any testing:

> I did not do any testing[,] that's simply a—a nontrivial test to do.  What I did was an analysis in terms of looking at[] what I define as the spring bellows chamber, looking at that as a control volume, and in doing a thermal analysis on that control volume, looking at heat input for that system and heat output from that system.  From there, I could get an estimate, based on that analysis, of what that temperature that the bellows is immersed in as a function of the rate at which heat is input into that system.

(8/19/2022 White Dep. Tr. at 202:8–203:1, Doc. 552-6.)  Nowhere in White's analysis is there empirical data showing that the thermal environment the HNBR bellows sees in the Class Vehicles' water pumps is in fact more demanding than what it would see in external water pumps and by how much.

A crucial premise in White's theory of the Defect—that the HNBR elastomer bellows will degrade "much faster" in the Class Vehicles' internal water pumps than in other water pumps—is purely hypothetical.  At most, White's analysis shows that he has good grounds to believe that the thermal environment of internal water pumps is generally more demanding than that of external water pumps.  White's analysis does not show, however, what effect—if any—this more demanding thermal environment has on the performance of the HNBR elastomer bellows in the Class Vehicles' water pumps relative to external water pumps.  White hypothesizes, based on a thermodynamic analysis, that the HNBR in internal water pumps will degrade much faster in internal water pumps, but he fails to show either the fact of accelerated degradation or that degradation is accelerated such that failures happen more often or earlier.

That HNBR degrades is an inevitability, not a defect—there is no dispute that HNBR elastomer bellows will degrade over time in external and internal water pumps alike.  Degradation will indicate a defect only if it is shown not only that degradation is in

fact accelerated in a certain application, but also that the accelerated degradation affects performance.  Here, White has shown neither.  Accordingly, the Court finds that White's theory of the Defect at best demonstrates what is a necessary condition of a defect—that HNBR elastomer bellows degrade—but not sufficient conditions—that the HNBR elastomer bellows in the Class Vehicles degrade faster and perform worse than in other vehicles.  This alone warrants exclusion of his testimony about the Defect.

### 2.  White's Opinion on the Four Failed Water Pumps Is Hypothetical

The gaps in White's explanations of how the Design Defect causes the water pumps in the Class Vehicles to fail also warrant exclusion.  The Court addresses White's conclusion that the four failed water pumps that he examined failed due to the Defect first, then turns to his opinion that the Defect is the "root cause" of the water pump failures in the Class Vehicles.

Regarding the four failed water pumps that he examined, White explains in that the HNBR bellows that he removed from the four failed water pumps "showed material damage and/or a loss of elasticity[,]" noting that "[t]he severity of the material damage to the elastomer bellows varied between the four Failed Pumps."  (*Id.* ¶ 117.)  White measured the HNBR bellows from the four failed pumps to show that the bellows exhibited permanent compression set or deformation, which he argues "allows coolant to leak past the mechanical seal."  (*Id.* ¶¶ 117–118.)  White then relies on a mathematical engineering analysis to demonstrate "[t]he scenarios in which degradation of the HNBR bellows will lead to a leak past the mechanical seal[.]"  (*Id.* ¶¶ 117, 120–159.)

White's analysis and scenarios are not founded upon and do not incorporate any empirical testing, nor does White determine how—*i.e.*, under which of the scenarios that he outlines—each of the water pumps that he examined failed.  In sum, White observes that the HNBR bellows in the water pumps that he examined showed varying levels of

17

degradation and offers various hypotheses about how that degradation resulted in the water pumps' failure, but he does not show that any of those scenarios in fact caused failure in the water pumps that he examined.

White's observation that the bellows that he examined showed degradation and material damage is not enough to support his hypotheses about how degradation of the HNBR elastomer bellows causes water pump failures in the Class Vehicles. As an initial matter, White's Merits Report does not explicitly address and rule out other possible failure modes for the water pumps that he examined. During oral argument, the Court pressed Plaintiffs' counsel on this issue, who stated that although White ruled out other possible failure modes for the four pumps that he examined, he did not rule out other possible failure modes for the Class Vehicles' water pumps generally. White also testified in deposition that he considered "all potential failure modes" when he examined and analyzed the failed water pumps. (4/22/2022 White Dep. Tr. at 117:9–19, 118:16–22, Doc. 552-5.) Yet the process by which White considered and ruled out other potential failure modes for the water pumps that he examined cannot be ascertained from either his Merits Report or his deposition testimony.

That White does not explain clearly how he ruled out other possible causes of the failure of the water pumps that he examined matters because, as White himself testified, "[t]he catastrophic failure of the pump . . . is a violent process, so that's why the bellows could be of different degrees of damage." (*Id.* at 114:18–22; *see also id.* at 138:16–24 ("[A]gain, the catastrophic failure is very violent and, you know, almost very difficult to— to model, in effect, to determine essentially what the ultimate sort of end result on the—on the components will be, so, again, I am not surprised by—by the differences between the bellows in the different failed pumps.").) That is to say: the material degradation and damage to the HNBR bellows that White examined firsthand could be the result—rather than the cause—of those water pumps' failure. White offers no explanation as to how he determined that the HNBR bellows that he inspected became deformed and damaged

18

before the water pumps' failure rather than as the pumps were failing. That is, nothing in White's Merits Report sets forth how he distinguishes between HNBR bellows deformation and damage that are *causes* of water pump failure rather than the failure's *effects*.

What's failure to explain how he—or anyone else, for that matter—can distinguish between degradation of the HNBR bellows that preceded a water pump's failure and degradation that accompanied or succeeded the failure is fatal to his diagnosis. There is no genuine dispute that excessive heat—that is, heat significantly higher than expected under normal conditions absent any problems—near the HNBR bellows can result from various causes. (See 8/19/White Dep. Tr. at 25:18–29:14; 59:17–22; 60:8–61:13; 61:14–62:9; 201:15–25; 228:12–229:3; Cho Decl., Ex. 40 (MAZDAWP-WHITE-000289), Doc. 548-3.) The mechanical seal in a water pump can see overheating due to various problems unrelated to the HNBR elastomer bellows—to name a few examples, due to a failing cooling fan, insufficient coolant, cavitation, or metal-to-metal contact—and excessive heat attributable to that problem can degrade and damage the HNBR bellows, resulting in water pump failure. If that is the case, degradation and damage of the HNBR bellows did not cause the water pump to fail—attributing the failure to the HNBR bellows requires overlooking the cause of whatever abnormal overheating event that damaged the bellows and resulted in the water pump's failure. When the HNBR bellows becomes degraded or damaged due to overheating caused by something else, it is not failing to perform as expected, but rather failing in an abnormal, unexpected condition. If a part fails to perform under abnormal conditions, that does not indicate a defective design that caused its failure. Instead, it shows that the part failed along with other components due to a prior, unexpected problem.

For the foregoing reasons and on the evidence before it, the Court cannot ascertain how it can conclude that White applied a reliable methodology to rule out other possible failure modes for the four failed water pumps that he examined. Accordingly, the Court

finds that White's opinion that the four water pumps that he examined failed because of the Defect is inadmissible.

### 3. White's "Root Cause" Opinion Is Not Adequately Supported

Even more important than White's opinion about what caused the four water pumps that he examined to fail is his conclusion that the Design Defect is "the root cause of the Internal Water Pump failures in the Class Vehicles." (White Merits Rep. ¶ 161.) Mazda argues that there is no dispute that there are many causes for water pump failures. (MSJ Reply at 2 & n.5.) During oral argument, Plaintiffs' counsel represented to the Court that White recognizes that water pump failures in the Class Vehicles can be attributed to causes other than degradation of the HNBR elastomer bellows and that White ruled out alternative causes *for the four pumps that he examined*. The Court concludes that White failed to bridge the analytical gap between his conclusion about the four pumps he examined and his conclusion as to the "root cause" of water pump failure in all Class Vehicles.

First, White has done nothing to "systematically assess and rule out other possible root causes," or to account in any way for other factors or causes that can lead to water pump failures. *Siqueiros v. General Motors LLC*, 2022 WL 74182, at *7 (N.D. Cal. Jan. 7, 2022). Even if the Court were to credit White's claim that the Defect is present in all the Class Vehicles because it is a design defect and the Class Vehicles' water pumps share substantially the same design, White's failure to address other causes and factors that lead to water pump failures fatally undermines his attempt to extrapolate from four water pump failures to the effects of the Defect in the Class Vehicles generally. *Cf. id* at *7–8 (holding that, because an engineering expert "provide[d] no scientific explanation or methodology for his extrapolation" he "ha[d] not shown that his opinions as to the root cause and issues in all Class Vehicles are 'the product of reliable principles and methods' that are appropriately applied to the facts in the record.").

20

Indeed, White's deposition testimony makes it clear that his theory of the Defect is indifferent to how the Defect affects the real-world performance of the Class Vehicles. For example, when asked whether he had attempted to estimate the failure rate for the Class Vehicles' water pumps, White testified:

> Well, what I was focused on was essentially looking at the design of the internal water pump and in particular if there was a design defect. I identified a design defect, and that design defect exists independent of the failure rate. It wasn't something I considered or even was concerned with. It's does this pump have a design defect [sic].

(4/22/2022 White Dep. Tr. at 80:10–21.)

White further elaborated:

> My opinion is that the internal water pump has a design defect, and that defect is the use of HNBR in its present design, it's fully immersed in the coolant and it will degrade over time. I didn't think about predicting when that failure would occur and nor did I look at life data. It's just a design defect in the design. They should not have used HNBR in an internal water pump without taking precautions regarding its degradation over time when immersed in coolant.

(Id. at 83:12–20.) And, when asked whether he had an opinion as to "how many failures have occurred as a result of this defect," White responded: "[T]he fact that there is a defect is independent of how many failed prior to 150,000 miles. The defect exists." (Id. at 86:10–16.) In response to a follow-up question whether he had "an opinion on what the expected manifestation rate would be for failures caused by the design defect," White responded: "I don't have an opinion. [M]y opinion is that the design defect will cause vehicles to fail prior to the 150,000 miles." (Id. at 86:18–87:4.)

White admittedly did not undertake any effort to assess the overall impact of the Defect on the Class Vehicles and has no opinion on how many pumps failed because of the

Defect.  If, as no one disputes, water pumps can and do fail for various reasons and there is no measure of how many of the Class Vehicles' water pumps failed because of the Defect, there is no basis for concluding that the Defect is even a primary or significant cause of water pump failures—let alone *the* root cause.

Moreover, while White claims to rely on production documents as supporting his root cause theory, he does not point to any analysis by other engineers who inspected failed water pumps concluding that degradation or hardening of the bellows *caused* any given water pump in the Class Vehicles to fail.  Rather, what White says is that the analyses in production documents that he reviewed "*are fully in line with* my opinion that degradation of the bellows will cause the elastomer bellows to lose elasticity, resulting in compression set and water pump failure."  (White Merits Rep. ¶ 60 (emphasis added).)  Even White's interpretation of the production documents that he reviewed does not directly support his theory that degradation of the HNBR elastomer bellows in the Class Vehicles' water pumps *causes* their failure.  The putative consistency that White notes between his hypotheses and the analyses in the production documents that he reviewed means not that those analyses *confirm* his hypotheses, but that they *do not disprove it*.  That is not enough: the absence of contrary proof is not confirmation.

Even if the Court credits White's interpretation of the production documents, that interpretation is inadequate to nudge his hypothesis that bellows degradation and compression set cause water pump failures in the Class Vehicles beyond speculation.  And hypotheses that are plausible but "not necessarily true" are "ripe for testing"—that is, they must be "verified by testing, not by submitting them to lay juries for a vote."  *In re Incretin-Based Therapies Prod. Liab. Litig.*, 524 F. Supp. 3d 1007, 1042 (S.D. Cal. 2021), *aff'd*, No. 21-55342, 2022 WL 898595 (9th Cir. Mar. 28, 2022) (quoting *In re Denture Cream Products Liab. Litig.*, 795 F. Supp. 2d 1345, 1367 (S.D. Fla. 2011)); *see also Belville v. Ford Motor Co.*, 919 F.3d 224, 234 (4th Cir. 2019) (affirming the district court's exclusion of expert testimony in automotive defect cased in light of the

"considerable gap between [his] theory and any evidentiary proof of causation" and the expert's failure to validate his hypothesis through testing on exemplar vehicles).

In light of the above, the Court recognizes that, although this case is readily distinguishable from *Grodzitsky v. American Honda Motor Co.* ("*Grodzitsky II*"), 957 F.3d 979 (9th Cir. 2020), the cases are similar in one crucial respect.  As the Court explained at class certification, in *Grodzitsky* the district court was especially critical of the putative expert Akhavein's claim that any window regulators that failed prematurely in the class vehicles "more likely than not" failed because of the design defect that he had identified. *Grodzitsky v. Am. Honda Motor Co.* ("*Grodzitsky I*"), 2017 WL 8943159, at *4 (C.D. Cal. Oct. 30, 2017).  The court concluded that exclusion of Akhavein's testimony was warranted in part because "to make this sort of probabilistic claim about a larger population based on an inspection of a smaller subset, some minimal level of statistical significance needs to be met." *Id.*

A divided panel of the Ninth Circuit affirmed the district court's decision to exclude Akhavein's testimony altogether, with the dissent urging that partial—not complete—exclusion would have been the appropriate remedy.  But even the dissent recognized that "Akhavein's views on the probabilities that any given failure is due to the alleged defect, and Akhavein's opinion that the alleged defect in fact caused the regulators he examined to fail" had been properly excluded because Akhavein failed "to test a statistically significant number of regulators to opine on the probabilities that any given Honda Pilot regulator failed because of the alleged defect." *Grodzitsky II*, 957 F.3d at 988 (Murguia, J., dissenting).

White's opinion that the Defect is "the root cause" of water pump failures in the Class Vehicles, though not couched in probabilistic terms, involves the same type of extrapolation from a statistically insignificant set of examples to the Class Vehicles as a whole.  "Root cause" means, at a minimum, something along the lines of "the main cause," "the primary cause," or—and this is stretching it—"a major cause."  Under even the most

lenient reading of *Grodzitsky*, favoring one cause over other alternative causes as White does requires analysis of a statistically significant sample of failed parts. The Court finds nowhere in White's Merits Report any explanation as to why four failed pumps are a statistically significant sample from which to draw general conclusions about what causes water pump failures in the Class Vehicles. In this respect, White's analysis is as deficient as Akhavein's excluded testimony.

For the foregoing reasons, the Court concludes that "there is simply too great an analytical gap between the data" and White's opinion that the Defect is the "root cause" of the water pump failures in the Class Vehicles. *Joiner*, 522 U.S. at 146. Indeed, the Court cannot see how White can testify at all as to the effects of the Design Defect on the Class Vehicles, as his engineering analysis is hypothetical and without confirmation through either testing or real-world data. White's analysis, that is, lacks the basis in "objective, verifiable evidence" it needs to rise above inadmissible speculation. *Domingo*, 289 F.3d at 607; *see also Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 677 (6th Cir. 2010) ("[W]hat science treats as a useful but untested hypothesis the law should generally treat as inadmissible speculation."); *In re Incretin-Based Therapies*, 524 F. Supp. 3d at 1042 (same). Accordingly, the Court finds that White's opinion that the Defect is the "root cause" of water pump failures in the Class Vehicles is inadmissible.

### 4. White's Opinion About Ford's 2020 Redesign Is Irrelevant

Last, the Court addresses White's opinion that water pump design revisions implemented by Ford in 2020 "addressed the Design Defect." (White Merits Rep. ¶ 108.) Because, as explained above, White's opinion that the Defect causes water pumps in the Class Vehicles to fail prematurely is not founded on a reliable methodology or sufficient data, his testimony cannot establish that the Defect is, in fact, a defect. Although the existence of a better, safer design can be relevant to establishing that a product is

defectively designed, "evidence of the design defect must be adduced first" and "[m]erely demonstrating a safer alternative exists does not render the chosen design defective." *Johnson v. Ford Motor Co.*, 2018 WL 1512377, at *6 (S.D.W. Va. Mar. 26, 2018*), aff'd sub nom. Belville v. Ford Motor Co.*, 919 F.3d 224 (4th Cir. 2019). As another court in this District explained in *Lassen v. Nissan North America, Inc.*, 211 F. Supp. 3d 1267 (C.D. Cal. 2016), the alleged defectiveness of a product cannot be proven "by the retrospective standards of products liability law" in the consumer fraud context. *Id.* at 1287–88. Without showing that the water pumps in the Class Vehicles perform worse than water pumps in comparable vehicles or that the Defect causes them to fail prematurely, White cannot show that they are in fact defectively designed. That Ford ultimately implemented design revisions in its water pumps does not show that the Class Vehicles' water pumps were defective. Indeed, there is no evidence in the record that water pumps with the 2020 revised design perform better than the Class Vehicles' water pumps. Accordingly, the Court concludes that White's opinion about the Ford 2020 water pump design revisions is not relevant and cannot be adduced to prove the Defect.

If White's testimony regarding the Design Defect is inadmissible, several consequences follow, which the Court addresses below.

## B.  NO OTHER EVIDENCE OF A COMMON DESIGN DEFECT

Aside from White's opinions and testimony, Plaintiffs have not proffered any evidence that the Design Defect causes the water pumps in the Class Vehicles to fail prematurely. Although Plaintiffs point to numerous production documents that they assert are *consistent* with White's Design Defect theory, none of the documentary evidence that Plaintiffs have proffered posits a causal link between water pump failures in the Class Vehicles and the design of the Class Vehicles' water pumps or engines. To prove that the Class Vehicles' water pumps fail prematurely due to the Design Defect, Plaintiffs rely

25

entirely on White's analysis.  Thus, if White's testimony regarding the effect of the Design Defect on the Class Vehicles' water pumps is excluded, Plaintiffs have no evidence that the Design Defect causes the Class Vehicles' water pumps to fail.

## C.  THE CAUSE OF PLAINTIFFS' WATER PUMP FAILURES

In moving for summary judgment, Mazda argues that "Plaintiffs have not presented any admissible and competent proof that [the] Defect caused *their* pumps to fail."  (MSJ Mem. at 19.)  In Opposition, Plaintiffs assert, citing White, that the Design Defect is "the root cause of the Internal Water Pump failures in the Class Vehicles" and that "[d]ue to this Defect, each Plaintiff experienced Internal Water Pump failure before 150,000 miles[.]"  (MSJ Opp. at 3.)

Plaintiffs argue that there is substantial evidence showing that the Defect causes failure of the Class Vehicles' water pumps prior to the expected service life of the engine, though the only evidence that they cite in support of that proposition is White's Merits Report.  (*See id.* at 21; PSOF ¶¶ 8, 9, 10, 18, 21, at 21–25.)  Plaintiffs then argue that each named Plaintiff here suffered a cognizable injury due to the Defect because they all experienced water pump failures before their vehicles reached 150,000 miles.  (MSJ Opp. at 21; PSOF ¶¶ 25, 105, 114, 120, 126, at 26, 37–38.)  To support the proposition that "Due to the Defect, each Plaintiff experienced Internal Water Pump failure in their Class Vehicles before 150,000 miles," Plaintiffs cite only to each named Plaintiff's deposition testimony describing his or her experience of water pump failure and their interrogatory responses.  (*See* PSOF ¶ 25, at 26.)  According to Plaintiffs, White's opinions about the Defect and Plaintiffs' testimony about their experiences of water pump failure are "more than sufficient to withstand summary judgment" on whether the Defect caused their injury. (MSJ Opp. at 22–23.)  Plaintiffs analogize this case to *Johnson v. Nissan N. Am., Inc.*, 2022 WL 2869528 (N.D. Cal. July 21, 2022), where the district court ruled that evidence

of a defect from plaintiffs' experts was "sufficient to survive summary judgment on its own" and further supported by the plaintiffs' testimony of experiencing the result of the defect. *Id*. at *13.

Without White's opinion that the Defect is "the root cause" of water pump failures in the Class Vehicles, Plaintiffs cannot establish that they each experienced premature water pump failure due to the Defect. Because the Court has determined that White's opinions about the Design Defect's effect on the internal water pumps in the Class Vehicles is not admissible, Plaintiffs have no evidence to tie their experience of water pump failure to a *design* defect shared by all Class Vehicles. That makes this case dissimilar from *Johnson*: there, plaintiffs had presented *admissible* expert testimony that would enable the trier of fact to extrapolate from the plaintiffs' experiences of their sunroofs shattering under normal conditions to the entire class.

Though the Court recognizes that there may be cases in which expert testimony is not required to prove that an automobile or other product malfunctioned due to a defect, that is not one of those cases. How automotive engines and cooling systems function is a highly technical subject, and there is no question that whether a water pump failed due to a defective design, defectively manufactured parts, or any number of idiosyncratic causes is not something that a lay juror can determine without expert testimony. *Cf. Kamerik v. Depuy Orthopaedics, Inc.*, 2013 WL 12322041, at *4 (C.D. Cal. Jan. 28, 2013) (holding, in the product liability context, that expert testimony is indispensable "[w]hen a plaintiff relies on a theory plainly beyond the common experience of both judges and jurors[.]").

What caused any given water pump's failure requires highly specialized automotive engineering expertise and is indisputably "beyond the common knowledge of the average layman." *Braverman v. BMW of N. Am., LLC*, 2021 WL 1020408, at *3 (C.D. Cal. Mar. 17, 2021) (citing *Torres v. Taser Intern., Inc.*, 277 F. App'x. 684, 687 (9th Cir. 2008)). While Plaintiffs can testify that the water pumps in their vehicles failed, they are not competent to testify about *why* they failed. Unaided by expert testimony on causation, a

jury could only speculate as to whether Plaintiffs' water pumps failed due to a defective design or another cause. *Cf. Grimstad v. FCA US LLC*,  2018 WL 6427339, at *6 (C.D. Cal. Dec. 3, 2018) ("[T]he fact that Plaintiffs' vehicle had a problem or needed a repair does not equate to proof of any defect.") (citing *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1029 (9th Cir. 2017)).  The admissible evidence before the Court does not provide a sufficient basis on which a reasonable trier of fact could find—rather than guess—that a design defect caused any of Plaintiffs' injuries.

## D.  THE DESIGN DEFECT IS NOT AN ACTIONABLE DEFECT

At most, Plaintiffs' evidence could establish at trial that the Design Defect *can* cause some of the water pumps in the Class Vehicles to fail.  That makes this case analogous to *Johnson v. Ford Motor Co.*, 2018 WL 1512377 (S.D.W. Va. Mar. 26, 2018), where the district court held that although many drivers' experiences and complaints of unintended acceleration were "credible and likely caused by some defects," the plaintiffs could not meet their burden on summary judgment because their "theory [was] still largely hypothetical." *Id.* at *3.  The Fourth Circuit affirmed, noting that the plaintiffs' consumer protection claims under various state statutes could not survive summary judgment because "Ford does not have a duty to warn consumers of an unproven risk or danger associated with a hypothetical and unproven defect." *Belville*, 919 F.3d at 236 n.9. Similarly here, water pump failures can and do occur in all automobiles; that a water pump failed is not evidence that it was defectively designed.  Without any evidence to tie their experiences of water pump failure or other water pump failures in the field to the Design Defect, Plaintiffs' theory is, like the *Johnson* plaintiffs' theory, "largely hypothetical."

A defect that is largely hypothetical is not an actionable defect under the laws on which Plaintiffs' claims are based.  To defeat summary judgment on those claims, Plaintiffs need to proffer "evidence linking [the Design Defect] to the real-world

performance of the [Class Vehicles' water pumps]"—*i.e.*, "evidence that the [Design Defect] actually cause[s] [unexpected water pump failures in the Class Vehicles]."  *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Pracs. & Prod. Liab. Litig.* ("*In re Hybrid Brakes*"), 959 F. Supp. 2d 1244, 1249 (C.D. Cal. 2013), *aff'd sub nom. Kramer v. Toyota Motor Corp.*, 668 F. App'x 765 (9th Cir. 2016) (applying California consumer protection and warranty law); *see also Hodsdon v. Mars, Inc.*, 891 F.3d 857, 862–64 (9th Cir. 2018) (holding that safety-related defects and defects that affect a product's central functioning are actionable under California's consumer protection statutes).

Further, Plaintiffs would need to show that the Defect not only causes the water pumps in the Class Vehicles to fail prematurely, but also that it substantially affects the safety of the Class Vehicles.  As the Ninth Circuit held in *Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017), "speculative" or "conjectural and hypothetical" safety defects are not actionable under California consumer protection law.  *Id.* at 1028–29.  Furthermore, an alleged defect that is "primarily one of accelerated timing rather than the manifestation of a wholly abnormal condition" will not be actionable as a safety hazard because a defect whose manifestation results in "premature, but usually post-warranty, onset of a natural condition raises concerns about the use of consumer fraud statutes to impermissibly extend a product's warranty period."  *Id.* at 1029 (citing *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141–42 (9th Cir. 2012) (recognizing that unless liability for failure to disclose a defect is limited to unreasonable safety risks, "the failure of a product to last forever would become a 'defect,' a manufacturer would no longer be able to issue limited warranties, and product defect litigation would become as widespread as manufacturing itself")).[5]  Plaintiffs have not shown that the standard for an actionable

---

[5] *Wilson* remains binding precedent in the Ninth Circuit.  *See Taleshpour v. Apple, Inc.*, No. 21-16282, 2022 WL 1577802, at *1 (9th Cir. May 19, 2022).  Further, to the extent that subsequent California Court of Appeal opinions indicate that there is a duty to disclose defects that do not pose a safety hazard, they concern alleged defects that affected a product's central function within the warranty period.  In *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249 (2011), the
(footnote continued)

defect under other jurisdictions' consumer fraud laws is materially different from the California standard as applied by the Ninth Circuit.  And, at any rate, Plaintiffs have not shown that a hypothetical defect would be actionable at common law or under consumer protection statutes in the jurisdictions at issue here.

Because Plaintiffs have not proffered competent evidence of either the Defect's effect on the Class Vehicles' real-world performance or its impact on their safety, the Court concludes that Plaintiffs cannot show that it would be material to a reasonable consumer and therefore actionable on consumer fraud or implied warranty theories.

As discussed above, Plaintiffs cannot rely on their experiences as evidence of how the Design Defect affects the real-world performance of the Class Vehicles because they have no evidence to prove that their water pumps failed due to the Defect.  Plaintiffs also cannot rely on other consumers' experiences of water pump failure in the Class Vehicles for the same reason: there is no evidence that the Defect caused *any* of those water pump failures.  Thus, Plaintiffs cannot adduce their own experiences or other class members' experiences as evidence of any safety hazard or costly repairs that they argue are attributable to the Design Defect.  (*See* MSJ Opp. at 16 ("Given Mazda's superior and exclusive knowledge of the Defect, the substantial cost of repair, and the associated safety risk, Mazda had a duty to disclose the Defect under all relevant laws.").)

Putting aside Plaintiffs' individual experiences of water pump failure in their Class Vehicles, Plaintiffs have not proffered any evidence that would enable a trier of fact to assess whether the Design Defect has a class-wide impact on the Class Vehicles without

---

plaintiffs alleged a defect that resulted in data loss in floppy disks within the warranty period.  *Id.* at 252–54.  In *Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164 (2015), the plaintiffs alleged that the screens in their notebook computers had started malfunctioning due to a defect within the warranty period as well.  *Id.* at 1171 ("Degenshein experienced problems with his display screen blacking out shortly before the expiration of his one-year warranty, but did not notify HP of the problem with his notebook until two months after the warranty had expired."); *id.* at 1182 ("Giuliano-Ghahramani notified HP of a problem with the display screen of her notebook computer within the one-year warranty period.").  Because here all of Plaintiffs' water pumps failed outside the warranty period, there is no reason for the Court to go beyond *Yamaha* and *Wilson* to address this issue.

speculating.  First, Plaintiffs have taken the position that failure rates do not matter and have not presented any evidence that the water pumps—or the engines—in the Class Vehicles fail at a higher rate than other automobiles.  Mazda, on the other hand, has put forth a failure rate analysis performed by Mazda in 2018 that concluded that water pump and engine failures in CX-9 vehicles were comparable to the CX-7 vehicles, which have an external water pump.  (MSJ Mem. at 12; Defs.' Ex. 41 (MNAO-024431), Doc. 414-22.) Plaintiffs dispute the accuracy and reliability of Mazda's figures, but they have not proffered alternative calculations.  (*See* MSJ Opp. at 15; PSOF ¶ 91, at 34.)  Whether Plaintiffs' criticisms are correct or not, there is no evidence that would enable a non-speculative finding that the Class Vehicles' water pumps or engines fail at higher rates than those of other vehicles.

The Ninth Circuit's unpublished opinion in *Beaty v. Ford Motor Co.*, 854 F. App'x 845 (9th Cir. 2021), is not to the contrary.  There, the Ninth Circuit did not hold that failure rates are irrelevant in defect cases such as this one.  It held, rather, that a reasonable juror could find that a defect that caused panoramic sunroofs in the vehicles in suit to explode spontaneously in only 0.05% of cases was "a material fact, given that the practical question is whether to purchase a luxury accessory at a premium."  *Id.* at 849–50.  Unlike panoramic sunroofs, water pumps are not a luxury item: every automobile with an internal combustion engine has a water pump—nobody pays extra to have a water pump in their vehicle.

But, more importantly, while a reasonable consumer would not expect panoramic sunroofs to explode spontaneously and under normal driving conditions, the same cannot be said about premature water pump failures.  Water pumps can and do fail for various reasons, including within a vehicle's warranty period.  Mazda's Powertrain Limited Warranty specifically identifies the water pump as a part that may require replacement within 5 years or 60,000 miles.  (*See* Defs.' Ex. 28 at MNAO-003565–67, Doc. 412-28.) Furthermore, purchasers of used cars receive a federally mandated Buyers Guide that

represents as one of several "major defects that may occur in used vehicles" an "[i]mproperly functioning water pump." 16 C.F.R. § 455. Here, unlike in *Beaty*, it matters whether the Class Vehicles' water pumps fail more frequently or not because the baseline is different: a reasonable consumer would understand that a water pump can fail, so that the *relative likelihood* of that happening—rather than its *mere possibility*—would be the material information. Without evidence that the water pumps in the Class Vehicles fail earlier or more frequently, there is no evidentiary basis to find that a reasonable consumer would consider the Design Defect material.

Plaintiffs also argue that "that water pump failures in vehicles with external water pumps, like the CX-7, are easier and less expensive to diagnose and repair and significantly less likely to lead to catastrophic engine failure than Internal Water Pump failures in the CX-9." (MSJ Opp. at 15.) But Plaintiffs have not proffered any evidence to support their claim that leaks in internal water pumps are generally more difficult to detect than leaks in external water pumps or any evidence tending to show that the Class Vehicles' water pumps are more likely to fail without warning because of the Defect.

In sum, there is no cognizable evidence before the Court that would support a finding that the internal water pumps in the Class Vehicles are more prone to failure than other vehicles' water pumps—let alone that they are more prone to failure because of the Defect. Nor is there any evidence before the Court that water pump failures in the Class Vehicle tend to occur more suddenly and unexpectedly than water pump failures in other vehicles, making catastrophic engine failure a comparatively more likely consequence of a water pump failure in the Class Vehicles. Without such evidence, no reasonable trier of fact could conclude that the Design Defect renders the Class Vehicles more prone to malfunction or less safe than other vehicles—*i.e.*, that the Design Defect somehow impairs the Class Vehicles' real-world performance. Thus, Plaintiffs lack the evidence to demonstrate that the Design Defect is an actionable defect under the relevant state consumer protection laws and common law of fraud.

### E.  MAZDA IS ENTITLED TO SUMMARY JUDGMENT

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Celotex*, 477 U.S. at 323 (cleaned up).  Here, the parties agree that Plaintiffs must prove that the Design Defect caused them injury to prevail on any of their remaining claims at trial.  (*See* MSJ Mem. at 18–21; MSJ Opp. at 21–23; MSJ Reply at 20–23.)  This is consistent with case law applying various state consumer protection statutes, California's Song-Beverly Consumer Warranty Act, and common law fraud.  *See, e.g.*, *Grimstad*, 2018 WL 6427339, at *6–7 (holding that causation was "an essential element" for the plaintiffs' claims, including their California consumer protection and fraudulent concealment claims); *Johnson*, 2018 WL 1512377, at *7–9 (granting summary judgment on consumer protection and fraud claims brought under the laws of seventeen different states after the plaintiffs failed to meet "their burden of demonstrating manifestation of the alleged defect" by proffering competent evidence that the problems with their vehicles "likely were caused by the alleged defect"); *In re Hybrid Brakes*, 959 F. Supp. 2d at 1245–51 (granting summary judgment on UCL, CLRA, and Song-Beverly breach of implied warranty claims for lack of evidence of a causal connection between the alleged defect and the vehicle's real-world performance); *O'Shea v. Ford Motor Co.*, 2011 WL 12876170 (C.D. Cal. Dec. 28, 2011) (same).

Mazda has met its burden of demonstrating lack of proof supporting causation by proffering evidence showing that there are many possible causes unrelated to the Design Defect that can cause water pump failure and Plaintiffs have not presented any evidence that their water pumps failed due to the Defect.  (*See* MSJ Mem. at 18–21; MSJ Reply at

2–3, 3 n.5, 20–21.)  Because the Court has ruled that White's opinions regarding the Defect are inadmissible, Plaintiffs have not met—indeed, cannot meet—their burden of showing that the Defect caused their water pumps to fail.  Plaintiffs also have proffered no evidence of Defect's impact on the performance or safety of the Class Vehicles, so there is no evidence before the Court that a common actionable defect exists in the Class Vehicles. Accordingly, Mazda is entitled to summary judgment on Plaintiffs' remaining common law fraud, consumer protection, and breach of implied warranty claims.

## IV.    CONCLUSION

For the foregoing reasons, Mazda's  Motion to Exclude the Merits Report and Testimony of Christopher White, Ph.D. and Motion for Summary Judgment are GRANTED.  Because Plaintiffs no longer have individual claims against Mazda, the Court DECERTIFIES all Classes in this action for lack of a representative plaintiff.  The Court also DENIES AS MOOT all other motions pending before it.

Mazda is ORDERED to file a proposed judgment within seven days of the issuance of this Order.


DATED:  February 23, 2023


_____
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE